FARMWORKER JUSTICE FUND, INC., et al., Petitioners,

v.

William E. BROCK, Secretary of Labor, et al., Respondents.

No. 85–1824.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 1986.

Decided Feb. 6, 1987.

Opinion and Judgment Vacated as Moot May 7, 1987.

**614**

Petition for Review of an Order of the Occupational Safety and Health Administration.

George H. Mernick, III, with whom William A. Bradford, Jr. and Patricia A. Brannon, Washington, D.C., were on brief, for petitioners.

Mark B. Stern, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Leonard Schaitman, Atty., Dept. of Justice and Joseph M. Woodward, Counsel, Dept. of Labor, Washington, D.C., were on brief, for respondents. Alfred R. Mollin, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondents.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL *, Senior District Judge.

Opinion for the Court filed by Chief Judge WALD.

Concurring opinion filed by Senior District Judge WILL.

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The Secretary of Labor administers his authority to set occupational safety and health

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

WALD, Chief Judge:

This appeal culminates a 14–year struggle to compel the Secretary of Labor under the Occupational and Health Safety Act (OSH Act) to issue a field sanitation standard providing access to drinking water and toilets for several million American agricultural workers.[1] The rulemaking record demonstrates beyond dispute that lack of drinking water and toilets causes the spread of contagion, bladder disease, and heat-prostration among farmworkers. Yet resistance to issuing the standard, a counterpart of which is already in place for every other OSHA-covered type of employment, has been intractable. An arsenal of administrative law doctrines has provided the justification for ricocheting the case between the agency and the courts for over a decade: a decade in which field workers have gone without benefit of drinking water or the most rudimentary sanitary facilities. With our decision today ordering the field sanitation rule to issue, we hope to bring to an end this disgraceful chapter of legal neglect.

## I. History

In September 1972, El Congreso, an organization that represents Hispanic American citizens, including agricultural workers, petitioned the Secretary to promulgate a field sanitation standard requiring access to drinking water, handwashing facilities and portable toilets. When nothing had happened by December 1973, El Congreso brought suit in the United States District Court for the District of Columbia to compel the Secretary to issue the standard. In December 1974, the Standards Advisory Committee on Agriculture, to whom the Secretary had referred El Congreso's peti-

standards under the OSH Act, 29 U.S.C. § 655, through the Occupational Safety and Health Administration (OSHA). The parties refer to the Secretary and OSHA interchangeably. We will follow this practice.

tion for factfinding and a recommendation, sent an approved standard back to the Secretary.

Ten months later, in October 1975, the District Court held that "[t]he Secretary's failure to publish the proposed rule [or explain his failure to do so] in the Federal Register within sixty days after the Advisory Committee's recommendation violates the mandatory time limits of the Occupational Safety and Health Act." [2] *National Congress of Hispanic American Citizens (El Congreso) v. Dunlop*, 425 F.Supp. 900, 903 (D.D.C.1975). The District Court then ordered the Secretary to "proceed within the Act's time limits toward publishing final … field sanitation standards." *Id.*

The Secretary appealed this decision to this court. While the appeal was pending, on April 27, 1976, the Department of Labor published notice of a proposed field sanitation standard and invited public comment until July 6, 1976. The Notice of Proposed Rulemaking contained the following explanation of the need for a field sanitation standard:

> The absence or inadequacy of basic sanitation and hygiene has long been recognized by medical science as a principal factor in the transmission of fecal-born bacterial and viral diseases and other debilitating parasitic infections.
> … The direct effect of improved safe-drinking water and proper excreta disposal is exemplified by the eradication in this country of cholera, typhoid and paratyphoid fevers and reduced evidence of dysentery, infant diarrhea, hookworm and other intestinal and parasitic infections.
> A standard for sanitation has been in effect for all permanent workplaces since OSHA first began promulgating its regu-

lations in 1971. Facilities for sanitation have also been required in the construction industry and in temporary labor camps.

At the present time, there are no such health standards for agricultural employees working in the field. Those who are engaged in field labor have the same physiological and hygienic needs, and are exposed to similar health hazard risks as their industrial counterparts. These risks are often exacerbated as a result of exposure to toxic substances and severe climatic conditions.

.    .    .    .    .

> There is substantial medical evidence of human strain which results from working without adequate water intake under hot environmental conditions…. Making drinking water of potable quality easily accessible to workers will help prevent such problems.

.    .    .    .    .

> Incidents of infection and disease which are transmitted by both insect-borne and hand-to-mouth contagion may be reduced by the use of toilet and hand-washing facilities…. [Also,] especially among women, [there] has been prolonged retention often resulting in the development of painful bladder disease.

41 Fed.Reg. 17,576, 17,576–77 (April 27, 1976).

Despite the Notice of Proposed Rulemaking describing the need for a field sanitation standard, the Secretary still had not issued the standard by April of the following year. At that time, this court reversed the District Court's mandate to issue the standard on the ground that the language of 29 U.S.C. § 655(b), relied upon by the

---

**2.** The OSH Act expressly provides a timetable for rulemaking. First, "[w]here an advisory committee is appointed and the Secretary determines that a rule should be issued, he shall publish the proposed rule *within sixty days* after submission of the advisory committee's recommendations." 29 U.S.C. § 655(b)(2) (emphasis added). Second, once the Secretary has issued a proposed standard, the Act provides for a time period in which interested persons can submit

comments and the Secretary may conduct hearings. Third,

> *[w]ithin sixty days* after the completion of any hearing held under paragraph (3), the Secretary *shall issue a rule* promulgating, modifying, or revoking an occupational safety or health standard *or make a determination that a rule should not be issued.*

*Id.* § 655(b)(4) (emphasis added).

District Court, could not be given literal effect in light of § 655(g), which states: "In determining the priority for establishing standards under this section, the Secretary shall give due regard to the urgency of the need for mandatory safety and health standards for particular industries, trades, crafts, occupations, businesses, workplaces or work environments." In our view, § 655(g) preserved "traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations, at any step of the rulemaking process." *National Congress of Hispanic American Citizens v. Usery*, 554 F.2d 1196, 1200 (D.C.Cir.1977) (*El Congreso I*). The case was remanded to the District Court with instructions to require the Secretary to submit a status report on the field sanitation standard and a timetable for the completion of rulemaking proceedings; if the District Court doubted the sincerity of the Secretary's explanation for the delay, it "should take such action as the circumstances require." *Id.*

In September 1977, the Secretary filed his report with the District Court.

> The agency regards a field sanitation standard as a matter of low priority. The hazards from lack of such a standard include transmission of bacteria and infection, and bladder disease. In the agency's judgment, these hazards are neither as serious as those presented by the substances, agents or physical conditions with respect to which rulemaking has been initiated, nor as serious as those presented by other substances for which rulemaking has not begun.

*National Congress of Hispanic American Citizens (El Congreso) v. Marshall*, 626 F.2d 882, 885 (D.C.Cir.1979) (*El Congreso II*) (quoting the Secretary's report). In the Secretary's view a field sanitation standard simply had to wait a while longer.

The District Court, however, found the Secretary's report inadequate because it lacked "a timetable for the completion of rulemaking proceedings" per the appellate court's instruction. In August 1978, the District Court ordered the Secretary to submit such a timetable for rulemaking to the court, but the Secretary in turn responded: "At the present time, the development of a field sanitation standard does not appear on the agency's 18-month planning horizon because of both generally limited agency resources and the relatively low priority assigned to these particular standards." 626 F.2d at 886 (quoting the Secretary's submission). Frustrated by the Secretary's refusal to provide any clues as to his future plans, the District Court ordered the Secretary to complete development of a field sanitation standard "as soon as possible." Memorandum Opinion at 5 (December 21, 1978) (quoted in *El Congreso II*, 626 F.2d at 884).

Once again, the Secretary appealed the District Court's decision. Once again, this court reversed, holding that the District Court had improperly substituted "its own view of appropriate priorities for standards development" by requiring the Secretary to complete the rulemaking "as soon as possible." *El Congreso II*, 626 F.2d at 889. We held that "the Secretary ha[d] reasonably exercised his discretion" on postponing field sanitation in order to confront more pressing priorities. *Id.*

Nevertheless, we also held that the Secretary could not delay the field sanitation rulemaking indefinitely. We noted that our prior opinion had "made clear that El Congreso was entitled to *some* timetable for the development of a field sanitation standard." *Id.* at 890 (emphasis in original). Given the acknowledged need for field sanitation, we said that the Secretary must promulgate a standard eventually:

> Where the Secretary deems a problem significant enough to warrant initiation of the standard setting process, the Act requires that we have a plan to shepherd through the development of the standard—that he takes pains, regardless of the press of other priorities, to ensure that the standard is not inadvertently lost in the process.
>
> It is not enough for the Secretary merely to state that the standard will not be issued over the next 18 months. If other

priorities preclude promulgation of a field sanitation standard within that timeframe, then the Secretary must provide a timetable—at least for the standard in question—which covers a larger period.

*Id.* at 890–91. Once again, we remanded the case to the District Court to "require the Secretary to provide such a timetable in accordance with this opinion." *Id.* at 891.

It took another two-and-a-half years for the parties to agree on a timetable. Under a settlement agreement approved by the District Court in July 1982, the Secretary promised to make a good faith effort to complete the standard within 31 months, *i.e.,* February 1985. Joint Appendix (J.A.) at 13. If the Secretary could not meet the deadline, he was required to petition the court for approval of an extension.

On March 1, 1983, the Secretary issued an Advance Notice of Proposed Rulemaking in the Federal Register, stating that the Department was reconsidering the proposed field sanitation standards published seven years earlier on April 27, 1976. 48 Fed.Reg. 8493. This publication repeated the basis for the earlier proposed rule:

> Considerable evidence exists in the history of the development of public health practices over the past few centuries to demonstrate the efficacy of providing clean drinking water, proper disposal of human wastes and employment of hygienic practices in preventing the transmission of communicable diseases. There is no evidence in the record to show that agricultural field workers are less susceptible when exposed to disease producing organisms than other workers.

*Id.* at 8495. The Secretary again pointed out, "[c]urrently, ... OSHA standards require sanitation facilities to be provided at the workplace for all groups of workers within the Agency's jurisdiction except agricultural workers." *Id.* at 8494. Nevertheless, the Secretary was unwilling to go forward with proceedings on the original proposed rule. Rather, because some comments on the original proposed standard criticized it "for being too broad in cover-

age and too specific in certain of its requirements," the Secretary invited further comment "to develop an appropriate new proposal." *Id.* at 8495.

One year later in March 1984, the Secretary issued his decision withdrawing the proposed standard of April 27, 1976, and replacing it with a new proposed field sanitation standard. 49 Fed.Reg. 7589, 7592 (March 1, 1984). The new proposal differed from the old one primarily in its limitation to farms "where 11 or more employees are engaged in hand labor operations in the field." 49 Fed.Reg. at 7599. Congress in the interim had prohibited the Secretary from using OSHA funds to regulate farms with 10 or fewer workers. *Compare* proposed 29 C.F.R. § 1928.110, 49 Fed.Reg. at 7604–05 (March 1, 1984), *with* proposed 29 C.F.R. § 1928.110, 41 Fed.Reg. at 17,578–79 (April 27, 1976).

In his new Notice of Proposed Rulemaking, however, the Secretary for the first time raised a question about the need for a federal standard at all: "in light of the existence of state field sanitation standards covering a substantial portion of such workers[,] and in light of the fact of voluntary provision of these items [drinking water, toilet and handwashing facilities] by agricultural employers[,] there is a serious question whether the evidence establishes the need for a federal field sanitation standard." 49 Fed.Reg. at 7591. The Secretary directed OSHA to conduct public hearings addressing this issue. *Id.* at 7591–92.

In January 1985, one month before the 31–month deadline set forth in the settlement agreement was due to run out, the Secretary filed a request with the District Court for an extension of time, claiming that the new rulemaking proceeding could not be completed until April 16, 1985, at the earliest.

On March 6, 1985, without ruling on the extension issue, the District Court transferred the case to this court under the authority of *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW v. Dono-*

**618**

*van,* 756 F.2d 162 (D.C.1985).[3] Then, on March 29, 1985, this court decided the issue: "Respondents have met their burden of demonstrating that the proposed deviation from the time frame set out in the settlement agreement is in good faith." J.A. at 35. We added, however, this note of caution: "we will look with extreme displeasure on any variance from the schedule and will not hesitate to set a date certain for completion of the administrative proceeding if they unreasonably delay." *Id.*

On April 16, 1985, the Secretary issued a "[f]inal [d]etermination ... that a federal field sanitation standard will not be issued at this time." 50 Fed.Reg. 15,086, 15,087. The Secretary cited two reasons for this decision, which it characterized as "Priorities" and "Federalism." As to "Priorities," the Secretary stated:

[A] federal field sanitation standard, if promulgated, would, in accordance with well-settled OSHA policy, be given a very low priority in enforcement relative to most other health standards already in effect and in development (e.g., asbestos, lead, various chemical carcinogens). It would not be appropriate to divert resources from the enforcement of other OSHA health standards already in effect and protecting workers from more life-threatening chemical exposures.

50 Fed.Reg. at 15,088.

As to "Federalism," the Secretary stated: " 'Federalism' involves a concept designed to restore an appropriate balance of responsibility between state and federal government and is appropriately applied in those instances where states are already taking charge of their police power responsibilities." 50 Fed.Reg. at 15,090. Thus, the Secretary "believe[d] it more appropriate that the states, which increasingly are moving to regulate this problem, be allowed to do so in accordance with each state's specific concerns for public health

and particular conditions in agriculture." *Id.* at 15,088.

Eight days after this "final" decision, the newly appointed Secretary of Labor, William E. Brock, stated during his confirmation hearings that he would reconsider this no-standard decision. *See* Respondents' Brief at 7. On October 21, 1985, Secretary Brock in fact did revoke the April 16 decision, but he did not promulgate a field sanitation standard in its stead. Rather, he announced he would delay promulgation of a national standard for an additional *two years* in order to give state governments an opportunity to develop and implement their own adequate field sanitation standards. At the end of the first 18 months of this two-year period,

OSHA will evaluate the states' response. If the Agency determines that the states have acted to adequately protect farmworkers, no further federal action would be required. However, if OSHA determines that the states' response is inadequate, then within 6 months after that determination OSHA will issue its own field sanitation standard.

50 Fed.Reg. 42,660, 42,662.

The Secretary justified this decision as follows:

... the *clear evidence* in the record to date of *unacceptable risks* to the health of farmworkers arising from the *currently inadequate provision* of sanitary facilities and drinking water at their worksites means that the decision not to issue a federal standard must now be set aside. While not rejecting the policy reasons set forth in the April 16 determination, the Secretary now finds that a different balance must be struck in order to give proper weight to the health risks posed. Thus, based on his review of the record, the Secretary has reached a determination that *further regulation is required* to deal with farmworkers' health problems. However, he continues

---

**3.** *Donovan* was an application to OSH Act rulemaking of the principle set forth in *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984), that this court has exclu-

sive jurisdiction over claims of delay in agency decisionmaking when this court has exclusive jurisdiction over the final agency decision.

to believe that state action responsive to this need would be preferable to, and more effective than federal action. He therefore has decided to afford the states an opportunity to take adequate action to protect farmworkers, and he is offering assistance to the states for this task. In the event that the states fail within the specified time to take advantage of this opportunity, the Secretary is committed to promulgating a federal standard to provide such protection. Because the Secretary believes that further regulation, preferably on a state level, is needed to protect farmers adequately and because the April 16 determination not to issue a federal standard did not adequately take into account the health risks posed, that decision is hereby superseded.

*Id.* at 42,600 (emphasis added).

Now, 14 years after the original petition was filed with the Secretary, petitioners' challenge to this latest decision by the Secretary not to issue the standard is before us.[4]

## II. JUDICIAL REVIEW OF THE SCOPE AND EXERCISE OF AGENCY DISCRETION

Although this court has reviewed the Secretary's failure to promulgate a field

sanitation standard on three prior occasions, we feel compelled to address anew the principles of judicial review that apply to a decision by the Secretary to withhold or delay promulgation of a standard. On more than one of these occasions, we have stated that, under the OSH Act, the Secretary has a certain amount of "discretion" in determining whether, when, and how to set standards "to serve the purposes of [the Act]," 29 U.S.C. § 655(b)(1). *See El Congreso I & II.* Nevertheless, we have also suggested that this discretion is not unlimited and that the agency's failure to promulgate a field sanitation standard is not immune from judicial scrutiny. *See El Congreso II;* Order of March 29, 1985. Principles of judicial review governing agency discretion not to take action remain a source of continuing controversy, however, and recent developments in the law require that we revisit the issue.

█ In *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court established that, unless another statute precludes judicial review, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.,* provides that agency decisionmaking may be judicially reviewed for compliance with two basic criteria.[5] First, an agency cannot exercise its discretion in a

---

**4.** This action, No. 85–1824, is technically a separate one from the original case filed in the District Court in December 1973 and transferred to this court in March 1985, No. 85–1176. After the April 16 decision, this court dismissed No. 85–1176 pursuant to the provision in the settlement agreement that "Plaintiffs agree to the complete and final dismissal of this action when a field sanitation standard is promulgated, or when Defendants publish a determination under the *Occupational Safety and Health Act of 1970* not to promulgate a field sanitation standard." J.A. at 12–13 (citation omitted). Challenge to the April 16 decision went forward before this court in a separate action, No. 85–1349; the settlement agreement having provided that "Plaintiffs reserve any and all rights to challenge ... [a] decision not to promulgate a standard." *Id.* at 13. Another panel of this court dismissed No. 85–1349 after the Secretary revoked the April 16 decision. At the same time, that panel denied petitioners' motion to reinstate No. 85–1176, presumably because any and all challenges to the October 21 decision are

properly before this court in this action. *See* Order, No. 85–1359 (May 7, 1986).

Petitioners here challenge the October 21 decision as a violation of the settlement agreement as well as a violation of the OSH Act and the APA. Respondents answer, alternatively, either that their duties under the settlement agreement were fully performed by the April 16th "final" decision, or that petitioners' rights under the settlement agreement were extinguished by the decisions of this court to dismiss and deny reinstatement of No. 85–1176. Because we rule for the petitioners on statutory grounds, we need not consider any issues relating to the settlement agreement.

**5.** In this opinion, we need address only substantive challenges to agency decisionmaking. We will not discuss the standards under the APA for judicial review of agency procedures, as set forth in *Overton Park,* 401 U.S. at 417, 91 S.Ct. at 824, and *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

manner contrary to law. The scope of an agency's discretion is bounded by law; an agency cannot justify a decision by reference to its discretionary authority, if the decision lies beyond the scope of the agency's discretion. Therefore, "[t]he court is first required to decide whether the Secretary acted within the scope of his authority." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. A statute may define as off-limits to an agency a particular basis for a decision, just as it may foreclose a particular result altogether. For example, the OSH Act directs the Secretary of Labor to regulate toxic materials "to the extent feasible," 29 U.S.C. § 655(b)(5), and the Supreme Court has held that this language precludes the Secretary from using cost-benefit analysis in deciding how to exercise his standard-setting authority under the statute: "[a]ny standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the command set forth in [§ 655(b)(5) ]." *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 509, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981). Thus, if an agency rests a decision on statutorily impermissible considerations, a reviewing court must set aside the decision as beyond the scope of the agency's discretion.[6]

Second, an agency may not abuse its discretion. Even within the scope of authority established by statute, an agency's decision may nonetheless be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A); *see*

*Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. For example, an agency's decision may be based upon the precise factors that Congress intended, but its balancing of those factors may be so unreasonable as to constitute an "abuse of discretion." *Id.* The Supreme Court has stressed, however, that judicial review for arbitrariness, in contrast to lawlessness, is "narrow" and deferential to agency judgment. The reviewing court may not "substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. Nevertheless, an agency's decision may on occasion transcend reasonableness and become a "clear error of judgment." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867; *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824. It was this second, "abuse of discretion" standard found in *Overton Park* that this court applied in *El Congreso II*. *See* 626 F.2d at 88–89.

After *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), however, there has been some uncertainty about how these principles apply in cases involving agency *inaction*.[7] In *Chaney*, the Supreme Court precluded judicial review of a decision by the Food and Drug Administration not to institute an enforcement proceeding against parties allegedly violating the Federal Food, Drug, and Cosmetic Act. More generally, the Supreme Court stated that "an agency's decision not

---

**6.** The Supreme Court has stated that "an agency rule would be arbitrary and capricious if the agency has relied on factors which the Congress has not intended it to consider...." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Analytically, it makes more sense to treat an agency's reliance on a factor "which Congress has not intended it to consider" as being contrary to law and outside the scope of the agency's discretion, rather than an "arbitrary" or "capricious" exercise of those powers within the scope of the agency's discretion. We can imagine an agency decision that could not be characterized as "arbitrary" and yet would be impermissible under the constraints established by Congress. In-

deed, *American Textiles* provides an easy example: a cost-benefit analysis may not be arbitrary, but in this circumstance it would contravene the dictates of the OSH Act. Whatever the characterization, *State Farm* makes clear that under the APA a reviewing court shall set aside an agency decision "if the agency has relied on factors which the Congress has not intended it to consider."

**7.** *See generally* Sunstein, Reviewing Agency Inaction After *Heckler v. Chaney*, 52 U.Chi.L.Rev. 653 (1985); Note, The Impact of *Heckler v. Chaney* on Judicial Review of Agency Decisions, 86 Colum.L.Rev. 1248 (1986).

to take enforcement action should be presumed immune from judicial review ... [although] the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33, 105 S.Ct. at 1656 (footnote omitted).

The *Chaney* holding derives from an ongoing effort to reconcile the APA's directive that a "reviewing court shall ... set aside agency action ... found to be ... an abuse of discretion," 5 U.S.C. § 706(2)(A), with a counterpart APA provision that judicial review under § 706 does not apply "to the extent that ... agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court observed in *Chaney* that in some circumstances agency decisionmaking may legitimately rely on factors whose evaluation depends so much on the agency's own expertise that it is not feasible for a court to review the decision even for "clear error," without improperly substituting its own judgment for the agency's. In the Court's words, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it is impossible to evaluate agency action for 'abuse of discretion.'" 470 U.S. at 830, 105 S.Ct. at 1655.

The Court reasoned that in circumstances where a court has no competence to determine if an agency has abused its discretion, judicial review is precluded under the terms of § 701(a)(2). Thus, the presumption that agency nonenforcement is unreviewable stems from the fact that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." 470 U.S. at 831, 105 S.Ct. at 1656. The Court identified such factors: "whether agency resources are best spent on this violation or another, ... whether the particular enforcement action is likely to suceed if it acts, and indeed, whether the agency has enough resources to undertake the action at all." *Id.*

Apart from such inherently unreviewable factors, the *Chaney* opinion acknowledges that most agency decisions rest on grounds that *are* susceptible to judicial review for "abuse of discretion." In these cases, the proper construction of §§ 701(a)(2) and 706(2)(A) requires a court to determine whether the agency's decision was "arbitrary" or "capricious." Furthermore, the Supreme Court's citation in *Chaney* to its earlier decision in *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), makes clear that this principle of reviewability applies to agency inaction as well as agency action.

In *Dunlop,* the Supreme Court held that a decision by the Secretary of Labor not to bring suit to set aside a union election in violation of the Labor-Management Reporting and Disclosure Act was subject to judicial review for abuse of discretion. Although cautioning that "since the statute relies on the special knowledge and discretion of the Secretary for the determination of the probable violation and the probable effect, clearly the reviewing court is not authorized to substitute its judgment for the decision of the Secretary not to bring suit," *id.* at 571, 95 S.Ct. at 1860, the Court went on to say that "the [reviewing] court may, however, ultimately come to the conclusion that the Secretary's statement of reasons on its face renders necessary the conclusion that his decision not to sue is so irrational as to constitute the decision arbitrary and capricious." *Id.* at 575, 95 S.Ct. at 1861. In explaining *Dunlop,* the *Chaney* opinion noted that "clearly defined factors were present" in the statute to guide judicial review in that case. 470 U.S. at 834, 105 S.Ct. at 1657 (internal quotation omitted). "Therefore," the *Chaney* Court stated, the Secretary's decision in *Dunlop* "was not beyond the judicial capacity to supervise." *Id.* (internal quotations omitted). Thus, *Heckler* assumes continued judicial review of agency inaction for abuse of discretion where the decision is based on factors that the court is competent to evaluate.

■ More important, the holding in *Chaney* in no way precludes judicial review of agency decisions that are contrary to law. Indeed, it is not possible to interpret § 701(a)(2) to reach that result. That provision, to repeat, precludes judicial review only "*to the extent that* ... agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added). As we have discussed, agency discretion is defined by and circumscribed by law. Whatever the *extent* of a particular agency's discretion under a particular statute, it does not encompass the authority to contravene statutory commands. Thus, even when "it is impossible [for a court] to evaluate agency action for abuse of discretion" (as to those factors on which the agency has relied that are peculiarly within its competence), *Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655, the court can—and must—review the agency's decision to determine that the agency has acted "within the scope of [its] authority," *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823, and did not rely on "factors that the Congress has not intended it to consider." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867. In fact, this court has already held that *Heckler v. Chaney* does not bar judicial review of agency decisionmaking to determine whether the agency relied on statutorily "impermissible or irrelevant factors." *Robbins v. Reagan,* 780 F.2d 37, 48 (D.C.Cir.1985) (per curiam).[8]

■ This principle applies to agency inaction as well as agency action. If, for example, the Secretary decided *not* to promulgate a standard relating to a partic-

ular toxic material because of his reliance on cost-benefit analysis, this decision "would be inconsistent with the command [of the OSH Act]" and must be set aside. *American Textiles,* 452 U.S. at 509, 101 S.Ct. at 2490; *see also State of Iowa ex. rel. Miller v. Block,* 771 F.2d 347, 352 (8th Cir.1985) (holding that *Chaney* does not bar judicial review of the Secretary of Agriculture's failure to promulgate rules for implementing disaster relief programs when "it is the clear duty of the Secretary to promulgate regulations which carry out the intent of Congress"), *cert. denied sub nom., Iowa ex rel. Miller v. Lyng,* — U.S. ——, 106 S.Ct. 3312, 3313, 92 L.Ed.2d 725 (1986). Moreover, *Chaney* itself states that, even in the context of nonenforcement, "[i]f [Congress] has indicated an intent to circumscribe agency enforcement discretion ... courts may require that the agency follow the law." 470 U.S. at 834, 105 S.Ct. at 1657.[9]

Thus, even after *Chaney,* the two basic principles of judicial review set forth in *Overton Park* still apply. If the grounds upon which the Secretary relied in his October 21, 1985 decision were impermissible under the OSH Act, then we must set aside the decision as beyond the scope of his authority and contrary to law. As long as the Secretary relied on permissible considerations, however, we are precluded from conducting any further judicial review if the evaluation of these factors depends so much on the agency's own expert judgment that it is impossible for this court to review the Secretary's decision even for "clear er-

---

8. For a list of cases in which "[c]ourts have ... held that claims that an agency has acted outside its statutory authority are reviewable even though its decision on the merits might be unreviewable as committed to agency discretion," *see Assiniboine and Sioux Tribes of Fort Peck Indian Reservations v. Board of Oil and Gas Conservation,* 792 F.2d 782 (9th Cir.1986). That case involved a statutory challenge to the Secretary of Interior's decision to enter into a "cooperative agreement" with the State of Montana for transfer of the Secretary's responsibilities under the Indian Mineral Leasing Act of 1938. The Secretary contended that the decision was unreviewable as an exercise of discretion. The Ninth Circuit held that *Chaney* did not bar judi-

cial review to determine whether it was an unlawful delegation of the Secretary's congressionally-determined responsibilities. We find this case is persuasive authority for our review of the not dissimilar "federalism" issues presented by the Secretary of Labor's October 21 decision.

9. Thus, *Chaney* itself acknowledges that courts can review agency decisionmaking to determine whether the agency has exceeded the scope of its authority. Much of the confusion following *Chaney* stems from the failure to distinguish between the two separate criteria of judicial review set forth in *Overton Park.*

ror." But if the OSH Act has provided "judicially manageable standards" for determining whether the Secretary has abused his discretion, we must conduct that review.[10]

## III. THE MERITS OF THE OCTOBER 21 DECISION

The Secretary's October 21 decision presents a novel question for judicial review: can the Secretary after completion of rulemaking proceedings, decide not to promulgate a proposed occupational safety or health standard he finds to be necessary to fulfill the purposes of the OSH Act solely in the hope that state governments will provide equivalent protection within the next two years? In this case, the new Secretary announced he was reversing his predecessor's decision not to issue a regulation because of his own assessment that there was "clear evidence" in the record of "unacceptable risks to the health of farmworkers arising from the currently inadequate provision of sanitary facilities and drinking water." 50 Fed.Reg. at 42,660. In reconsidering his predecessor's April 16 decision not to issue a field sanitation standard at all, the Secretary emphasized that he had "thoroughly reviewed [not only] the evidence in the record ... [but] the policy reasons behind that [earlier] determination,

[including] the severe limitations on OSHA's resources [and] OSHA's other priorities." *Id.* At the end of that review, the Secretary "reached a determination that further regulation is required to deal with farmworkers' health problems," and explicitly "commit[ed] OSHA to the issuance of a federal field sanitation standard within 24 months in the event the states do not take the necessary action within the next 18 months." *Id.* Thus, it is critical to keep in mind that in reviewing the Secretary's October 21 decision, the court is not evaluating the Secretary's fundamental administrative decision about how best to allocate his agency's resources or to order its priorities. The Secretary has already made that decision in favor of federal regulation of farmworkers' sanitation needs, based on current conditions. Rather, the court is reviewing only the second part of the Secretary's decision that, once the need for a particular occupational health standard has been shown in a rulemaking proceeding, the Secretary may nonetheless refuse to promulgate it, because of a desire or hope that the states will fill the regulatory gap. We will conduct this review in accordance with the standards set forth in Part II of this opinion.[11]

---

**10.** This court has held that a presumption of unreviewability does not apply to cases in which agencies have "unreasonably delayed" rulemaking proceedings contrary to 5 U.S.C. § 706(1). *See Oil, Chemical and Atomic Workers Int'l Union v. Zegeer,* 768 F.2d 1480, 1484 (D.C.Cir. 1985). While the present case has some features of a delay case, it also has other distinctive features. As we set forth in Part III, the October 21 decision is, essentially, a conditional withdrawal of a proposed rule after completion of rulemaking. Insofar as the October 21 decision explicitly commits the Secretary to promulgate a rule unless a certain condition prevails within a certain time, it differs from other types of agency inaction that this court has reviewed in the past. The closest precedent is a conditional postponement of the implementation of regulations that have been previously promulgated, a decision this court, prior to *Chaney,* reviewed for arbitrariness and capriciousness. *See Council for Southern Mountains, Inc. v. Donovan,* 653 F.2d 573, 583 (D.C.Cir.1981) (per curiam). We do not today establish any general

presumption for or against judicial review for abuse of discretion in "conditional-withdrawal-of-proposed-rulemaking" cases. Rather, because *Chaney* dictates that the appropriateness of judicial review of the Secretary's decision for abuse of discretion turns on whether the OSH Act provides "judicially manageable standards" for that review, we proceed directly to that inquiry.

**11.** Judge Williams concludes that a concern for allocating scarce resources played a major role in the Secretary's October decision. *See* Conc./Diss.Op. at 638–40. It did not. In contrast to the April decision, where "priorities" received its own separate, extended discussion, this consideration is mentioned only in a single sentence buried in the midst of the Secretary's discussion of why, although state regulation is preferable to federal regulation, the Secretary *will* nonetheless issue a federal standard if the states fail to act. *See* 50 Fed.Reg. at 42,661. Except for the single sentence on priorities and resources, the October decision focuses on an

### A. *The Impermissibility of the Secretary's First Two Justifications*

We first consider the import of the Secretary's frequent assertions that "state regulation of field sanitation is *preferable* to federal regulation," terminology repeated at three separate points in his October 21 decision. *Id.* at 42,661 (emphasis added); *see also id.* at 42,660 ("further regulation, preferably on a state level, is needed to protect farmers adequately"). This language is open to several different but not necessarily mutually exclusive interpretations.

#### 1. *The Secretary's belief about "appropriate" federal-state relations*

The October 21 decision appears to argue that in our American system of government, state regulation in aid of social needs or welfare is usually "preferable" to federal regulation for two reasons: citizens feel more in touch or at home with their state or local governments than with the federal bureaucracy in Washington and state governments are generally more competent to regulate than their federal counterpart.

Indeed, in the October 21 decision, the Secretary emphasized that "[s]tates without field sanitation standards can draw on their closer relationship with their constituents, both growers and farmworkers, and their long experience with analogous public health problems to promulgate and enforce appropriate standards," and continued that "[s]anitation, like many other public health issues, has traditionally been a primary concern of state and local officials." *Id.* at 42,661. These remarks suggest that the October 21 decision was motivated, in part, by the Secretary's concept about the proper roles of the federal and state governments in our system. The earlier April 16 decision was even more explicit in this respect: " 'Federalism' involves a concept designed to restore an appropriate balance of responsibility between state & federal government...." 50 Fed.Reg. at 15,090. Because in October the Secretary stated that he "continues to believe that state action ... would be preferable to ... federal action," we must assume that the October decision was based, at least to some degree, upon his particular view of "ap-

altogether different point which was also previously made by the prior Secretary in the April decision: that state regulation is preferable to federal regulation. Thus, the new Secretary's choice of what to emphasize and what not to emphasize from the former Secretary's decision is telling indeed. More important, the very turnabout nature of the October decision dictates this choice. The decision in October is that regardless of other priorities, the Secretary will regulate field sanitation but would still prefer state regulation. The arguments in support of this new decision must necessarily differ from those supporting the old one not to regulate at all, and thus the reasoning behind the April decision cannot be transported wholesale to uphold the October decision, even though deference to an agency's decisions on resource allocation is understandably the most comfortable legal basis on which to justify upholding an agency decision.

Moreover, contrary to Judge Williams' suggestion, Conc./Diss.Op. at 639, the Secretary in his October release never stated that he was forced to make a "choice" between regulating field sanitation and regulating other occupational hazards within OSHA's jurisdiction, like asbestos and toxic chemicals. Indeed, the Secretary gives no indication at all why enforcement of a federal field sanitation standard would have to

.affect these other areas of OSHA regulation at all. As we have previously noted, the Secretary enforces sanitation standards for all workers within his jurisdiction, except farmworkers. Thus, the Secretary could simply incorporate farmworkers into his overall sanitation budget without touching enforcement in other OSHA areas like toxic chemicals. Anticipating this argument, Judge Williams suggests that farms are different because "inspection of isolated farms would consume inspector driving time disproportionate to the safety and health payoff." Conc./Diss.Op. at 639. But this argument is fundamentally flawed: the Secretary already regulates farms under other OSH standards. *See, e.g.,* 29 C.F.R. § 1928.57 (1986) (safety of farm field equipment). Thus, the Secretary already devotes *some* resources to farm regulation. We in no way wish to state what portion of the Secretary's farm regulation budget, or overall sanitation budget, should be devoted to the regulation of field sanitation. We simply note that the current Secretary never said in his October decision, nor can we see any reason, why he cannot enforce a field sanitation standard without disrupting nonfarm, nonsanitation areas of enforcement. The fact remains we cannot reasonably read the October 21 decision as a resource allocation or priority decision.

prropriate" federal-state relations. 50 Fed. Reg. at 42,660.

■ To the extent, then, that the October decision rests on such a preference, the Secretary acted beyond the scope of his discretion.[12] Although the Secretary might prefer that state governments regulate "public health issues" because they have "traditionally been a primary concern of state and local officials," Congress, in adopting the OSH Act, decided that the federal government would take the lead in regulating the field of occupational health. However much the Secretary might wish to "restore" what he considers to be "an appropriate balance of responsibility between state and federal governments," he is bound to enforce what Congress already determined to be the "appropriate balance of responsibility between state and federal governments" in the field of occupational health and safety. *See American Textile,* 452 U.S. at 509, 101 S.Ct. at 2490. In short, the Secretary may not withhold or delay issuance of a standard within his jurisdiction because he holds a different vision of the federal government's role in this field than the role envisioned by Congress and enacted into law in the OSH statute.

Congress was most explicit about its own determination that the time had come for the federal government to assume primary responsibility for developing standards in the field of occupational health and safety. The OSH Act was premised on the following finding:

> The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, *to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources* ... by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to business affecting interstate commerce....

29 U.S.C. § 651(b) (emphasis added).

Recognizing that its decision to regulate occupational safety and health at the national level would subordinate the role of state regulation in this field, Congress adopted a specific mechanism whereby state governments could subsequently assume responsibility for the further development and enforcement of workplace safety and health standards after initial issuance by the Secretary. Section 18(b) of the OSH Act states:

> Any State, which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a state plan for the development of such standards and their enforcement.

29 U.S.C. § 667(b). Section 18(c) goes on to provide that the Secretary of Labor shall approve a state plan if, among other things, the plan "will be *at least as effective* in providing safe and health employment and places of employment [as a standard] under section 655 of this title which

---

**12.** Although our colleague disputes our conclusion that this belief in "federalism" factored into the Secretary's decision, he is not in disagreement with our holding that under the OSH Act views on the appropriate role of federal regulation in public health matters, which differ from Congress' own determination enacted into the statute, are impermissible grounds for the Secretary's decisionmaking in enforcing the statute. *See* Conc./Diss.Op. at 634, 637.

Judge Williams faults us for inserting ellipses in quoting two of the Secretary's sentences in Part III of this opinion. *See id.* at 618 n. 3.

We note that we have already quoted the Secretary in full in Part I. *See, supra,* at 618–619. Frankly, we do not understand how Judge Williams can conclude that a particular view of appropriate roles of the federal and state governments in the field of "public health" did not motivate the Secretary's October 21 decision *at all.* While we agree that other concerns may have contributed to the decision, the Secretary's own language necessitates the conclusion that this impermissible consideration played a substantial role.

relate[s] to the same issues...." 29 U.S.C. § 667(c) (emphasis added).

Thus, § 18 allows, and indeed encourages,[13] states to take charge of enforcement and development of standards, but in the context of a structure that requires the federal government to approve the state plan for meeting a national standard. Although § 18(a) lets state standards stay in place until there are federal standards in effect, there is no textual authorization whatsoever for the Secretary to withhold a federal standard simply because he would prefer state governments to take over the responsibility. *See* 29 U.S.C. § 667(a).

The legislative history of the OSH Act is replete with evidence that Congress explicitly considered the issue of federal-state relations and determined that the federal government, within the limits of its resources, must assume responsibility for initiating standards in the occupational health field. Both Reports emphasized the need for federal, as opposed to state, regulations in the workplace. The Senate Report stated:

> The problem of assuring safe and healthful workplaces for our working men and women ranks in importance with any that engage the national attention today....
>
> . . . . .
>
> Nor has state regulation proven sufficient to the need.... Moreover, in a state-by-state approach, the efforts of the more vigorous states are inevitably undermined by the shortsightedness of others. The inadequacy of anything less than a comprehensive, nationwide approach has been exemplified by experience with the chemical betanaphthylamine—a chemical so toxic that any exposure at all is likely to cause the development of bladder cancer over a period of years. The Commonwealth of Pennsylvania discovered this extreme effect of betanaphylamine and banned its use, manufacture, storage, or holding in that State, but production of this lethal chemi-

cal has begun in another State where legislation is inadequate.

S.Rep. No. 1282, 91st Cong., 2d Sess. 4 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5177, 5178.

The House Report contained even stronger language about the need for federal initiatives in regulating occupational safety and health:

> Clearly, the life of a worker in one state is as important as a worker's life in another state, and uniform standards must be required to protect all workers from dangerous substances [and conditions]. Despite this obvious need, state response has been minimal. Federal leadership and assistance are necessary to change this record of inaction.
>
> . . . . .
>
> As a nation, we simply have not faced up to the truth: our men, women, and children are being killed needlessly; they are being maimed, injured, disabled and infected on the job by largely preventable injuries and diseases.
>
> It is not accurate for those who oppose occupational safety and health legislation at the Federal level to state: "We are doing better."
>
> ... The well-being of every American working man and woman is an essential human right that we can no longer deny.

H.R.Rep. No. 1291, 91st Cong., 2d Sess. 15, 35 (1970).

The same sentiments permeated the floor debates on the OSH legislation. Senator Alan Cranston, a member of the Subcommittee on Labor that conducted extensive hearings around the country on the OSH legislation, stated:

> The Nation and the Congress must recognize that this problem is one of national scope, and that it should be a national responsibility. The hazards which characterize modern industry are not the problem of a single employer, a single industry, or a single State jurisdiction. The special interrelationship of industry

---

**13.** The OSH Act authorized the Secretary of Labor to grant funds to states to aid in their development of § 18 plans. *See* 29 U.S.C. § 672.

and the mobility of our workforce combine to require national action to protect the health and safety of the worker. 116 Cong.Rec. at 37,629 (November 19, 1970).

Indeed, there appears to have been very little disagreement on this point. As one sponsor of the House bill said, debate concerned "not whether we should put the resources of the Federal Government to work on this problem, but how best to do it." 116 Cong.Rec. at 38,370 (November 23, 1970) (remarks of Rep. William Steiger).[14] Another sponsor of the Steiger-Sikes bill reiterated the theme:

> I am not one who believes that we should inject the Federal Government into any area of activity without serious thought to all the effects. However, we are talking about a field where corrective legislation or constructive steps have been left in the hands of the States. We find that State regulation is not solving the problem, and it is growing ...
>
> ... The Congress already has enacted safety programs for a few of the more hazardous occupations. The plight of other workers is just as important and encompasses a much broader group. In fact, it is increasingly clear that the hazards which characterize the modern industry are not the problems of a single employer, a single industry, or a single State. The health and safety of the worker are a national concern. As a result, both President Johnson and President Nixon have urged enactment of a *comprehensive* program to meet the *total* range of occupational safety and health requirements.

*Id.* at 38,703–04 (remarks of Rep. Sikes) (emphasis added).[15]

Thus, we conclude that the Secretary is foreclosed from withholding or delaying occupational health and safety standards within his jurisdiction because he believes that state governments have a "closer relationship with their constituents" than the federal government, or because the states have considerable experience in confronting "public health problems." These grounds are not only sufficiently broad in nature to apply to any occupational health standard within the Secretary's jurisdiction, but they conflict with clearly articulated premises of the OSH Act. In short, the Secretary may not abdicate the responsibility which Congress entrusted to him, because he differs with the allocation of federal-state responsibility encapsulated in the Act. Insofar as the Secretary's statement that "state regulation of field sanitation is preferable to federal regulation" reflects a reliance on his particular vision of "federalism" as a reason for not issuing the farmworker standard now, we hold that this basis for the October 21 decision exceeded the scope of the Secretary's discretion under the OSH Act.

### 2. *Concern for workers on small farms*

In finding state regulation of field sanitation "preferable" to a federal field sanitation standard, the Secretary relied on other considerations in addition to his beliefs about appropriate federal-state relations. Another justification put forth for the Secretary's decision not to issue the federal standard for at least two years was based on Congress' express prohibition against the Secretary's regulating farms with 10 or fewer workers.[16] The Secretary appears to

---

**14.** In this comment, Rep. Steiger was referring to the dispute among legislators over whether the standard-setting authority should be delegated to the Secretary of Labor, or to an "independent commission" modeled after other federal commissions like the ICC, FCC and the SEC. All versions of the OSH legislation contained a § 18 provision. *See* 116 Cong.Rec. at 36,519.

**15.** For statements by other key members of Congress on the need for federal, as opposed to state, regulation, *see, e.g.,* 116 Cong.Rec. at 37,-

345 (remarks of Sen. Yarborough); *id.* at 38,374 (remarks of Rep. Cohelan); *id.* at 38,387–88 (remarks of Rep. Gaydos); *id.* at 38,389 (remarks of Rep. Annunzio); *id.* at 38,392 (remarks of Rep. Karth); *id.* at 38,709 (remarks of Rep. Helstoski).

**16.** In the last several years, Congress in appropriating funds for OSHA's annual budget has attached a condition that "none of the funds appropriated ... shall be obligated or expended to prescribe, issue, administer, or enforce any

rely on this prohibition as an affirmative reason to give the states a two year moratorium on federal regulation of all farms of whatever size. He argues that because "no such limitation is imposed on the states ... fewer farmworkers *would* be protected under a federal standard than *could* be protected by state standards." 50 Fed. Reg. at 42,661 (emphasis added). While this statement is literally true, it is also misleading and its relevance to the October 21 decision to delay a federal standard is so remote as to border on the nonexistent.

Judge Williams posits that the Secretary erroneously believed the promulgation of the proposed federal standard would preempt state regulation of field sanitation even as to farms with 10 or fewer workers. *See* Conc./Diss.Op. at 640–641. If such a belief were true, the promulgation of a federal standard might actually reduce the overall number of workers covered by a field sanitation standard, since it would wipe out existing state regulations, some of which cover farms with under 11 workers. The previous Secretary was in fact so misinformed, as revealed in the April 26 decision. 50 Fed.Reg. at 15,092. We, however, do not conclude that the new Secretary's October 21 decision was similarly misconceived in error. In his brief before this court, the Secretary clearly rejects this extreme view of a federal standard's preemptive effect and offers instead an alternate theory of why the congressional ban on OSHA regulation of 10–and–under farms is relevant, based on a much more limited preemptive theory: "While the states might theoretically regulate small

employers while OSHA regulated larger employers, ... because adoption of a federal standard would preempt state regulation of farms of over ten employees except in states with state plans, the actual effect of the federal standard might be to discourage new states from adopting standards and to discourage active enforcement of existing standards, even for those farms with ten or fewer workers." Respondents' Brief at 21.[17] True, the October decision itself is a bit ambiguous as to the precise scope of the preemption envisioned by the Secretary.[18] Nonetheless, because the earlier, more extreme notion of preemption is undoubtedly erroneous,[19] and the later, more limited view of preemption clearly enumerated in the brief is correct, we prefer to give the Secretary the benefit of the ambiguity and assume that the October decision adopts the correct preemption theory. If we are wrong, there is indisputably no rational basis for his decision grounded in concern over small farm regulation. And if we are right, his preemption argument still cannot rationally advance the October decision to delay issuance.

The October decision, by its own terms, makes the fate of a federal standard depend upon whether or not the states "provide protection equivalent to the federal field sanitation standard proposed in 1984 (49 FR 7589)." 50 Fed.Reg. at 42,661. The proposed standard, however, applies only to farms with more than 10 workers. *See* 49 Fed.Reg. at 7604. Hence, state regulation will be considered to afford equivalent protection so as to "preclude" a federal standard even if all states choose to regu-

---

standard, rule, regulation, or order under the Occupational Safety and Health Act of 1970 which is applicable to any person who is engaged in a farming operation which does not maintain a temporary labor camp and employs ten or fewer people." *E.g.,* 99 Stat. 1102, 1106 (1985).

17. *See also* Joint Appendix at 50 (April 16, 1986 statement of Acting Assistant Secretary for OSHA during congressional hearings on field sanitation) ("it is true that the states would be free in any case to regulate field sanitation on small farms where OSHA is prohibited from coverage").

18. The October notice states that "a federal standard would preempt all state standards in states that do not have OSHA approved state programs for occupational safety and health, including state standards, like Texas', that may be more protective than the proposed federal standard." 50 Fed.Reg. at 42,661. Because this sentence can be interpreted as referring to either of the alternative preemption theories, it is an insufficient basis for our inferring that it incorporated the erroneous theory contained in the April decision.

19. *See* Conc./Diss.Op. at 640–41.

late only farms with more than 10 workers. By its own terms, then, the October decision provides no motivation to encourage state regulation of 10–and–under farms.

■ But, more basically, even if the prospect of state regulation of smaller farms was a reasonable one, we still would not find it a permissible basis for the Secretary's decision.[20] The argument is made that the Secretary is justified in seeking protection through persuasion for the greatest number of farmworkers possible, even if he has to do so by withholding the protection it is within his power to provide to those farmworkers under his jurisdiction.[21] We disagree. We do not think the Secretary may gamble with the health and safety of those individuals whose welfare is entrusted to him by Congress in the hope that he can wield his influence over those individuals Congress has specifically placed beyond his legal jurisdiction. Presumably Congress had its own reason for removing 10–and–under farms from the Secretary's jurisdiction, while retaining his authority to regulate those farms with over 10 employees. Whatever that reason was, it flouts congressional intent to allow the Secretary to use the prohibition on his authority as a reason not to exercise the authority he was actually given when, in his own judgment, that authority needs to be exercised for employees in his jurisdiction. Thus, when, as here, the Secretary has determined that the need exists for a regulation affecting workers within his jurisdiction, it is not an adequate reason to postpone this regulation in order to encourage state regulation as to employees Congress has expressly placed outside the scope of his authority.[22]

### 3. Expectation of state action

The October decision appears also to have been motivated by a fervent hope that the states would in the near future achieve a field sanitation regulation equivalent to the proposed federal standard, thereby "preclud[ing] a need for federal action." 50 Fed.Reg. at 42,661. The Secretary thought he identified a trend:

Many states have shown considerable initiative in regulating sanitation in the agricultural fields. Currently, 13 states have field sanitation standards. Of these states, five have issued their standards within the last few years. Another two states are in the process of developing comparable standards.

**20.** Indeed, it is obvious why the Secretary did not condition the promulgation of the proposed federal standard on the states' failure to regulate field sanitation for all farmworkers, including those on 10–or–under farms, within 18 months. If the Secretary had done so, he would have openly violated the congressional rider, attempting to do indirectly what he could not do directly.

**21.** *See* Conc.Diss.Op. at 638, 642.

**22.** We must confess surprise that our colleague finds this conclusion "baffling[ ]"; it *seems* quite straightforward to us. *See* Conc./Diss.Op. at 638 n. 4. We suspect his bewilderment proceeds from a mistaken premise about the congressional rider. Judge Williams finds that the "congressional prohibition strongly colors this case" because "the regulation of both large and small farms can be done on a unified, coordinated basis *only* if the states do it." Id. at —— (emphasis in original). While that statement is obviously true, it is equally obvious that in adopting the rider Congress subordinated the value of "unified, coordinated" regulation of both large and small farms to the value of dividing farms into two categories for the purposes of federal regulation. If Congress had wanted the regulation of on-the-farm safety and health to be conducted in a "unified, coordinated" manner (but under no circumstances wanted the federal government regulating small farms), Congress easily could have prohibited the Secretary from regulating all farms. But Congress was evidently aware that the federal regulation of occupational health and safety risks on farms with more than 10 workers might prove sufficiently necessary to warrant dividing farms into two categories for regulatory purposes. Moreover, the value of unified regulation on the state level is only subordinated, not eliminated: if states wish to regulate both large and small farms under a single standard, they can do so under § 18 of the Act. Finally, even if the Secretary were ever permitted to gamble with the health and safety of workers within his jurisdiction to secure through state regulation what in his judgment would be even greater benefits en masse, the circumstances of this case made it a particularly foolish wager, for reasons we explain in Part III.B.

50 Fed.Reg. at 42,661 (citations to specific states omitted). Additionally, he noted that the 13 existing state standards covered at least 75% of the farmworkers that would be protected by the proposed federal standard. *Id.* The additional two-year delay can thus be seen as resting on an expectation that within another 18 months, as a result of additional state action, enough farmworkers would be covered by adequate state regulation that the need for a federal standard would no longer exist.

The issue for this court, then, is whether the Secretary may permissibly defer the promulgation of an acknowledgedly needed occupational safety or health standard on the hope or even expectation that the states may provide equivalent protection within a certain defined period. This question is not without difficulty. Certainly a reasonable argument can be made that, under the OSH Act, once the Secretary has determined that the need for regulation exists and that the states have not adequately addressed this need up to the present time, he may not withhold a ready federal standard in the hopes that they can be pushed to do so in the future. Rather, the Act requires the Secretary to take the initiative, leaving the states to proceed under § 18 if they choose to assume responsibility.

There is considerable support for this interpretation in the legislative history. Senator Williams, the Chairman of the Senate Committee on Labor and Public Welfare and a principal author of the legislation, talked about states enforcing their own standards in the absence of federal standards merely "in the interim period." 116 Cong.Rec. at 36,519. And several legislators spoke of § 18 as allowing states to "regain" or "re-establish" jurisdiction over

occupational safety and health, as if, except for the mechanism set forth in § 18, the states lost their traditional role in this field. *Id.* at 37,361 (remarks of Sen. Saxbe); *id.* at 38,376 (remarks of Rep. Cohelon). Moreover, *El Congreso II's* reference to the eventual implementation of a field sanitation standard can be read as supporting this position.

But there does exist a reasonable alternative interpretation allowing the Secretary to consider the adequacy of present or even imminent state regulation as a relevant factor in determining the need for a federal standard. In granting the Secretary the authority to decide *whether or not* to promulgate a federal standard on a particular issue, Congress meant the Secretary to consider the need for the proposed regulation, and the adequacy of state regulation can be viewed as a logical factor in that need assessment.[23] If every farmworker who would be protected by the proposed federal field sanitation regulation were covered by equally protective regulation at the state or local level, then the Secretary could reasonably conclude that there was no need for the federal standard and could legitimately decline to issue it. Similarly, if the Secretary had a reasonable basis for concluding that within a reasonably short period of time virtually all farmworkers who would be protected by his proposed field sanitation standard would be equivalently protected by state regulation, then the Secretary could permissibly defer promulgation of the federal standard for that short period.

■ Given some uncertainty as to Congress' intent on the point, we give the Secretary the benefit of the doubt. *Chevron U.S.A. Inc. v. Natural Resources De-*

---

**23.** Indeed, one House Committee member, who actively participated in the effort to reach a compromise between the Committee bill and the Steiger-Sikes substitute, used the existence of the § 18 mechanism to suggest that if every state quickly submitted a plan that met the approval of the Secretary, then there would be no need to pursue federal enforcement:

We do have a provision ... to allow the States to assume jurisdiction over the matter by sim-

ply submitting a State plan to the Secretary of Labor. Hopefully, all the States throughout the country will submit their plans immediately ... so that the Federal Government will not have to get into the area, and states can still continue to exercise jurisdiction in this important matter.

*Id.* at 38,383 (remarks of Rep. Hathaway).

*fense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In contrast to the other two grounds for the October decision, we find that the adequacy of existing or imminent state regulation is a permissible consideration under the OSH Act. The question then becomes whether in this case the Secretary acted reasonably in delaying the federal standard on this basis.

### B. *The Unreasonableness of the Two Year Delay*

■ The OSH Act provides us with "judicially manageable standards" to apply to the Secretary's limited discretion to consider the likelihood of equivalent state action as a justification for delaying a needed federal standard. First, in determining whether "enough" workers would be covered by present or anticipated state regulation to forestall the need for federal action, Congress has provided the clear standard of uniform nationwide regulation for all workers within OSHA's jurisdiction.[24] We need not go so far today as to say that 100% coverage is necessary, but certainly the states must come close to that mark to permit the Secretary to withhold a federal standard addressing what the Secretary has himself called "unacceptable risks to the health" of a particular class of workers within his jurisdiction. Indeed, as the October decision itself states, unless "the vast majority of hand laborers working in the field who presently are not covered by state standards will be protected" by new state regulation, a federal standard must issue. 50 Fed.Reg. at 42,662.

Second, in determining how much delay is reasonable, the OSH Act and its legislative history indicated that speed in achieving protection for workers was of paramount importance to Congress.[25] And as we have said in other OSHA contexts, we do not look upon delays as favorably "where human health is at stake." *International Union, United Automobile, Aerospace & Agricultural Workers of America, UAW v. Donovan,* 756 F.2d 162, 165 (D.C.Cir.1985); *see also Public Citizen Health Research Group v. Auchter,* 702 F.2d 1150, 1157 (D.C.Cir.1983) ("Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake.").

Finally, in determining whether the Secretary had adequate reasons based in the record for determining that enough states would act within a reasonable time, we need look no further than his own rationale, for the Act requires him to state the basis for his determination to issue or not to issue a standard after rulemaking. *See* 29 U.S.C. § 655(e). In this case, he did rely on the fact that currently a number of states had standards, several of which had been issued within the last "few years," and another few states were in the "process" of passing similar ones. If, however, a group of states whose participation is necessary to make the coverage sufficient had neither begun the process of promulgating adequate rules nor shown any predisposition toward doing so, then the Secretary's decision to postpone the federal standard would indeed be vulnerable to being struck under the "arbitrary and capricious" standard.

Tested against these standards, we find the Secretary's decision not a reasoned one. For one thing, the decision to delay a field sanitation standard yet again appears unreasonable in light of the prolonged delay that has already occurred in this case. A proposed regulation has been pending for over a decade and, after conducting several

---

**24.** The statute itself set up the goal of "safe and healthful working conditions" for *"every"* man and woman in the Nation." 29 U.S.C. § 651 (emphasis added). The House Report says that "[t]he life of the worker in one state is as important as a worker's life in another state," H.R. Rep. No. 1291 at 15, suggesting that if a single state neglects to protect its workers adequately, then a federal standard may be appropriate. Individual legislators also reiterated "this self-

evident need ... to set health and safety standards for *all* American workers." *See, e.g.,* 116 Cong.Rec. at 38,393 (November 23, 1970) (remarks of Rep. Broomfield) (emphasis added).

**25.** For an explanation of this sentiment by Senate Committee Chairman Williams, a principal author of the OSH legislation, *see, e.g.,* 116 Cong.Rec. at 37,325–27.

rulemaking proceedings, the Secretary has himself acknowledged that, regardless of other priorities, the federal government must act if the states do not hurry up and do so. The OSH Act and its legislative history emphasize speedy, national action; it is hard to reconcile that emphasis with an additional two year delay in these circumstances.

In this case, to recapitulate, the Secretary received the petition for a field sanitation standard in September 1972. Furthermore, the Secretary has officially acknowledged the need for the standard as long ago as April 1976 and as recently as October 1985. Under any yardstick, the state governments had already had ample opportunity to develop their own field sanitation standards by October 1985. In the absence of any extraordinary new developments, another two year delay was unreasonable. We find no mention or evidence of any such extraordinary developments to justify the Secretary's optimism about significant new state action in the near future.[26]

Conversely, the Secretary's "expectation" that adequate state regulation would materialize within 18 months had no basis, so far as we can tell, in the record. As the October notice itself states, at the time of the Secretary's decision, as many as 25% of the farmworkers within the Secretary's jurisdiction were not covered by any field sanitation standard,[27] and of the 37 states without regulation, only two were in the process of developing their own standards. 50 Fed.Reg. at 42,661. That means that 35 states had given no indication at all they were interested in moving. The only possible encouragement the Secretary had was the fact that within the last four years, five states had adopted their own field sanitation standards. See 50 Fed.Reg. at 47,661; Respondents' Brief at 20 n. 8. But this was hardly enough to justify an expectation that within one and a half years, anything approaching a majority of the remaining 35 states, which had shown no previous interest in field sanitation, would act "to assure that the vast majority of hand laborers working in the field who presently are not covered by state standards will be protected" by regulation equivalent to the proposed federal standard. 50 Fed.Reg. at 42,662. The Secretary's expectation otherwise was a will-of-the-wisp at best.

Nor can we credit the argument that his "threat" of federal regulation would prompt enough states into action to meet his announced goal. What threat can there be in a preemptive federal standard to induce a laggard state to regulate? If it does less than the federal standard, it will be preempted anyway. If it is anxious to do more, why has it waited so long? Indeed, hindsight supports our conclusion that the Secretary's expectation was unreasonable at the time he made his decision. As of November 1986, 12 states had indicated to the Secretary that they did *not* intend to develop field sanitation standards. Respondents' Letter to This Court (November 13, 1986). According to the Secretary's own estimates, these states alone contain 9% of the farmworkers within the Secretary's jurisdiction. *Id.* The unreasonableness of the Secretary's original expectations has proved out: state regulation cannot meet the Secretary's goal of "assur[ing]" that the vast majority [of farmworkers] who presently are not covered by state standards will be protected." *Id.* at 42,662. Our decision, however, is not based on hindsight but rather on the total

26. Judge Williams simply ignores the importance of the already longstanding delay in this case in assessing the reasonableness of the October decision.

27. Judge Williams states that a federal field sanitation standard "could at best increase coverage by an additional 4% to 9%." Conc./Diss. Op. at 639. But these numbers, taken from the April decision, refer to the percentage of *all* farmworkers who would be newly covered by the federal standard. Thus, the figure improperly incorporates the number of farmworkers on 10– and-under farms which are *outside* the scope of the Secretary's jurisdiction. *See* 50 Fed.Reg. at 15,092. Again, up to one-fourth (25%) of all farmworkers *within* the Secretary's jurisdiction who would receive protection are still unprotected by any field sanitation regulation. In October the Secretary himself acknowledged that this represents "a very large number of workers." 50 Fed.Reg. at 42,661.

inadequacy of the evidence in the record on October 21 to support the Secretary's decision to delay promulgation of the proposed field sanitation standards for another two years.

CONCLUSION

In *Public Citizen v. Steed*, 733 F.2d 93, 98, 105 (D.C.Cir.1984), "[i]n the context of a thirteen year gap twixt law and enforcement," we observed that "it is hard to imagine a more sorry performance of a congressional mandate than that carried out by NHTSA and its predecessors." Unfortunately, truth is often stranger than fantasy. In this case, for 14 years farmworkers have been unsuccessfully petitioning the Department of Labor to provide sanitation standards equivalent to those which the federal government under the OSH Act has guaranteed to *all other workers* in its jurisdiction. The Secretary's justification for the latest decision to delay reflected a combination of (1) his particular vision of "federalism," a vision categorically rejected by Congress when it originally passed the OSH Act, (2) a misplaced concern for farmworkers that Congress has removed from his jurisdiction, and (3) an unsupported and unrealistic hope that state governments would suddenly move, en masse, to fill the need. Thus, the Secretary has exceeded the scope of his authority and acted contrary to law in relying on (1) and (2), and delayed agency action unreasonably in relying on (3). Because 5 U.S.C. § 706(1) directs "[t]he reviewing court" to "compel agency action unlawfully withheld or unreasonably delayed," we now order the Secretary to issue the federal field sanitation standard, which he has admitted is necessary for the health and safety of farmworkers, within 30 days from the issuance of this mandate.

*It is so ordered.*

WILL, Senior District Judge, concurring.

I fully concur in Chief Judge Wald's excellent opinion. I write separately only to point out what I believe is an additional compelling ground for ordering the field sanitation rules to be issued forthwith. In my view, the Secretary of Labor's October 21, 1985 decision to delay the issuance of standards for an additional two years violated the 1982 settlement agreement between the parties.

On July 16, 1982, the district court entered the settlement agreement in Case No. 85–1176, a predecessor to this case involving the same parties and the same issue. *See ante* at 619 n. 4. The agreement provided that the Secretary would make a good faith effort to complete a field sanitation standard within 31 months (February 1985) and that the plaintiffs would have access to OSHA documents prepared in connection with the development of the standard. In addition, the agreement stated as follows:

> Plaintiffs agree to the final and complete dismissal of this action when a field sanitation standard is promulgated, or when Defendants publish a determination under the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, not to promulgate a field sanitation standard.... Plaintiffs reserve any and all rights to challenge ... the decision not to promulgate a standard.

The settlement agreement thus contemplated that the Secretary would, within the time frame prescribed, commit to one of two courses of action: issuing a standard or making a final decision not to adopt a standard. This assured the plaintiffs of obtaining either the full relief sought or, at the least, prompt judicial review. What was clearly foreclosed under the agreement was any further delay by the Secretary in either issuing a standard or deciding not to issue a standard.

On April 16, 1985, two months after the deadline under the settlement agreement, the Secretary published his "final" decision not to adopt any field sanitation standards. This decision became the subject of a new court challenge, No. 85–1349, filed on June 10, 1985. In accordance with the settlement agreement, the terms of which the Secretary apparently had satisfied, this

court dismissed the original case, No. 85–1176, on July 24, 1985.

At this point, if the Secretary had not changed course and decided to forestall final agency action for an additional two years, the farmworkers finally would have secured the judicial determination they had been pursuing since 1973. And given the massive, uncontradicted record indicating the inadequacy of the existing field conditions, the history of which is canvassed in Chief Judge Wald's opinion, the farmworkers had, at a minimum, a very good chance of success.

On October 21, 1985, however, the new Secretary of Labor, while making findings documenting the necessity for field sanitation standards, issued his decision to delay promulgation of a standard for two more years, during which time the states were to be given the opportunity to develop state standards at least equal to the proposed national standard. Since the primary reason for the enactment of the OSH Act and its provisions for uniform national standards was state inaction, it cannot have surprised the Secretary that only six states adopted standards, some of which fall below the proposed minimum, a substantial number of states took no action, and 12 others indicated they have no intention of adopting any standards.

The Secretary's October decision had the effect of vacating the April decision; accordingly, Case No. 85–1349, the action for review of the April decision, was mooted and dismissed. As before, the farmworkers were compelled to file a new case, this time the present action for review of the October decision. The October decision had the further effect of placing the Secretary in default of the settlement agreement. Instead of prompt judicial review, which was the farmworkers' fall-back position under the settlement agreement, the farmworkers were left, once again, with neither of the alternatives to which they were entitled.

The farmworkers certainly did not get the benefit of the bargain they entered into under the settlement agreement. Whether the Secretary's October 21, 1985 conduct is viewed as a breach of contract or merely as another in a long series of arbitrary and capricious delaying tactics, and whether it was in good faith or Machiavellian, the obvious result was to deprive the plaintiffs of both of their rights under the settlement agreement and to further delay the issuance of uniform standards for the only group of workers not protected by such standards. The Secretary's conduct was particularly egregious since the admittedly unsanitary conditions continue to adversely affect not only the farmworkers but *all* consumers of agricultural products handled by the farmworkers.

So viewed, this case is not about administrative inaction at all. Rather, it is about an agency taking affirmative steps to delay the performance of its legal duties while evading judicial review. A more compelling case for judicial intervention is difficult to imagine.

WILLIAMS, Circuit Judge, concurring and dissenting:

Moved by compelling evidence of the plight of many farmworkers, the majority speeds to their rescue. In so doing it attempts what courts are least suited to do: to allocate the resources of an administrative agency. Differing on several issues, I write separately.

I agree with the majority that *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), does not bar review. I write separately on this point only because I find the path toward reconciliation slightly more difficult. But, where scope of review is at stake, nuance is all. Justice Frankfurter noted in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 487, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951), that Congress in the Taft-Hartley Act had expressed a "mood" on scope of review, and one may say more generally that such issues are always ones in which the court strives to achieve the correct mood. I believe the mood compelled by *Chaney* is slightly more deferential than the majority suggests, particu-

larly in review of the Secretary's decision for abuse of discretion.

Once we undertake review, I find myself at almost complete odds with the majority. In reviewing for errors of law, the majority finds that the Secretary relied on a generalized preference for state regulation inconsistent with the statute. While I agree that such reliance would be an error of law, I believe the Secretary cannot fairly be said to have so relied. In concluding that he has, the majority wrests agency language out of context in order to obscure the Secretary's well-intentioned effort to reconcile his duties to assure an adequate working environment for farmworkers and others with Congress's express denial of jurisdiction over farms employing fewer than 11 workers. Oddly enough, however, the majority discounts the Secretary's genuine error of law—his mistaken understanding of the preemptive effect of a federal field sanitation standard.

Second, the majority finds an abuse of discretion in the agency's decision to withhold federal regulation temporarily in an effort to induce state action. Here the majority concedes that the Secretary may consider the adequacy of state regulation in determining whether to act, and, implicitly, that he may employ the device of threatening to impose federal regulations if, within the period for which he stays his hand, the states fail to respond adequately. But the majority finds his decision improper on the facts of this case. The defect in the majority's analysis lies in its failure to reach the key issue: whether the health benefits from immediate action on farmworkers are greater or less than the health benefits that may be achieved by use of the pressure tactics, including benefits arising from the Secretary's deployment of his enforcement resources in other workplaces.

Part I of this opinion explores the appropriate scope of review in the light of *Chaney*. Part II considers the asserted errors of law, both the one erroneously found by the majority and the one discounted. Part III considers the alleged abuse of discretion in the Secretary's decision to delay. Finally, Part IV addresses the impact on this dispute of an earlier settlement agreement between the parties.

## I. REVIEW OF NONPROMULGATION OF RULES AFTER *Chaney*

In *Chaney* persons condemned to capital punishment by lethal injection requested the Food and Drug Administration ("FDA") to take enforcement action against the drugs in question. The FDA refused and the Court found the decision to be "committed to agency discretion by law" and thus, under 5 U.S.C. § 701(a)(2), unreviewable for want of any law to apply. In reaching that result it invoked a presumption against judicial review of ad hoc enforcement steps.

*Chaney* is not directly applicable; the Court there expressly noted that the case did not "involve the question of agency discretion not to invoke rulemaking proceedings." 470 U.S. at 825 n. 2, 105 S.Ct. at 1652 n. 2. The form of inaction here—a delay aimed at promoting state regulation in order to eliminate the need for federal action—presents reviewability issues quite similar to those finessed in *Chaney*'s footnote.[1] Nonetheless, the principles announced in *Chaney* cast a considerable shadow over the present case.

In arriving at its negative presumption, the Court in *Chaney* relied on three features of nonenforcement decisions. First, such decisions usually require agency expertise and coordination in setting priorities for the use of scarce resources. *See id.* at 831–32, 105 S.Ct. at 1655–56. Second, they usually involve the agency's decision *not* to "exercise its *coercive* power over an individual's liberty or property rights." *Id.* at 832, 105 S.Ct. at 1656 (emphasis in original). Third, they are akin to prosecutorial decisions not to indict. *Id.*

---

**1.** The salient distinction between the two is, as noted *infra* this page, that here the Secretary has already invested most of the resources necessary to assess the problem and to identify suitable remedial rules.

The first element, resource allocation, is clearly relevant both to the garden-variety decision not to initiate rulemaking proceedings and to the present case. Here, however, the issue differs from simple noninitiation of rulemaking in that the Secretary has already committed resources to the inquiry into farm working conditions and the advisability of regulation. Thus, as in *Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), where the agency conducted rulemaking proceedings culminating in withdrawal of a prior rule, judicial intervention involves a relatively slight intrusion into the agency's rulemaking agenda. Affirmative promulgation, however, will obviously require enforcement resources, and the choice of allocating them to the farm, as opposed to other workplaces, is a *Chaney* resource-allocation issue writ large.

The second element, non-use of the state's coercive power against a citizen's liberty or property, is also relevant both to conventional decisions not to initiate rulemaking proceedings and to the present case. As in *Chaney*, the Secretary's inaction here will leave the state not acting against the liberty or property rights of citizens.

The third element, the analogy to prosecutorial discretion, appears to distinguish this case from *Chaney*. The *Chaney* Court does not identify the characteristics shared by prosecutorial discretion and agency nonenforcement (other than the two elements previously mentioned), but two such characteristics leap to mind. First, prosecutors and agencies typically have to make innumerable decisions not to enforce or to seek indictment. Second, each such decision typically is very fact-rich, requiring deep involvement in the details of the individual case at issue and little legal analysis. By contrast, decisions not to initiate rulemaking are less likely to be frequent and more likely to turn on the scope of the agency's authority. Almost by definition, *rule* making, or its negative, entails consideration of broad issues that are likely to become, or to turn upon, issues of law.

Supporting this analysis is the Court's distinction of cases where an agency "has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4. Such abdications would presumably be infrequent and, when they occurred, would present issues of legal interpretation rarely seen in the typical fact-intensive decision against enforcement. Thus it appears that the prosecutorial discretion analogy (apart from its recapitulation of *Chaney*'s first two factors) does not forcefully apply to a decision not to initiate a rulemaking (or act as the Secretary has here).

Moreover, under the Administrative Procedure Act ("APA") refusal of a petition to initiate rulemaking provides a focus for judicial review not present in conventional nonenforcement cases. In distinguishing enforcement action from nonenforcement, the Court in *Chaney* noted that "when an agency *does* act to enforce, that action itself provides a focus for judicial review," allowing a court "at least ... to determine whether the agency exceeded its statutory powers." *Chaney*, 470 U.S. at 832, 105 S.Ct. at 1656 (emphasis in original).

Here the APA provides a similar focal point. It requires every agency to provide opportunities to "petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e) (1982), and to give notice of denial of applications or petitions and "a brief statement of the grounds for denial," *id.* § 555(e). The combination of these requirements suggests a legislative expectation that agencies either declining to initiate rulemaking, or delaying final promulgation on the sort of theory alleged here, must reveal their thought processes. That expectation in turn suggests that courts may review such determinations for errors of law.

In sum, I find noninstitution of a rulemaking distinguishable from nonenforcement decisions in that the former tend to be (1) less frequent, (2) more typically

fraught with legal analysis (and therefore potential legal error), and (3) characteristically accompanied by public justification under the APA. Thus I believe that *Chaney* does not overturn prior decisions allowing review of agency decisions not to initiate rulemakings and, by inference, decisions of the sort the Secretary has made here.

Our cases, however, have rightly emphasized the high degree of deference to which a decision not to initiate rulemaking is entitled, *see ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1245–46 (D.C.Cir. 1983), *rev'd on other grounds,* 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984); *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1221 (D.C.Cir.1983), and that such a refusal is to be overturned "only in the rarest and most compelling of circumstances," *WWHT, Inc. v. FCC,* 656 F.2d 807, 818 (D.C.Cir.1981). Such judicial interventions, we have observed, "primarily involve plain errors of law, suggesting that the agency has been blind to the source of its delegated power." *State Farm Mutual Automobile Insurance Co. v. Department of Transportation,* 680 F.2d 206, 221 (D.C. Cir.1982), *vacated on other grounds,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

This leaves open the scope of review of the Secretary's discretion to delay promulgating a field sanitation standard in the hope of encouraging state action. *See* Majority Opinion ("Maj.Op.") at 631. This exercise of discretion involves precisely the resource-allocation issue identified by the Court in *Chaney* as a reason for presuming unreviewability—the question whether health gains from OSHA enforcement will be maximized by the Secretary's strategy or by that of the majority. This court has explicitly recognized the Secretary's discretion to set "priorities between the various occupations that may require standards" and "the Secretary's right to refuse to

adopt any standards even though the whole [rulemaking] process has been exhausted." *National Congress of Hispanic American Citizens v. Usery,* 554 F.2d 1196, 1199 (D.C.Cir.1977). But, by reading the Secretary's commitment to issue a standard *if* the states do not take adequate steps to regulate the area as an *absolute* commitment to allocating federal resources to this problem, *see* Maj.Op. at 623–624 n. 11, the majority sidesteps precisely the point that counsels judicial restraint: that the effectiveness of the Secretary's use of resources in this area comes at the expense of his not using those resources in other areas. Without acquiring a solid grasp of all the potential alternative uses of the resources that will be required for enforcement of the farmworker regulations, no court can intelligently weigh the issue.

To hold that this aspect of the decision is utterly beyond judicial review is tempting; it is, however, unnecessary to decision of the case. So long as we bear in mind the nature of the decision, it is clear that no judicially ascertainable abuse of discretion exists.

## II. ERRORS OF LAW

### A. *Preference for State Regulation*

I have no quarrel with Part II.A(1) of the majority opinion insofar as it simply concludes that the Secretary may not delay promulgation of field sanitation standards for farmworkers because he thinks that state regulation is generally preferable to federal regulation. In the area of occupational health and safety, Congress obviously decided otherwise. But the Secretary's reasoning was in fact far narrower. He merely responded in a practical way to special factors operating with regard to farmworkers, most notably *Congress*'s decision *absolutely to forbid* federal regulation of farms with fewer than 11 workers.[2] Confining to a footnote a discussion of the

---

**2.** Annual riders attached to bills appropriating funds to OSHA prevent the Secretary from spending any money to "prescribe, issue, administer, or enforce any standard, rule, regulation,

or order" applicable to farms not maintaining temporary labor camps and employing ten or fewer workers. *E.g.,* 99 Stat. 1102, 1106 (1985).

verbal surgery by which the majority has travestied the Secretary's reasoning,[3] I pass directly to the points the Secretary in fact made in comparing federal with state action in the context of field sanitation rules.

*Congress's ten-and-under restriction.* The Secretary correctly identified a circumstance that complicates federal regulation of farms as opposed to other worksites: Congress's determination that OSHA not regulate farms employing ten or fewer workers. *See, e.g.,* 99 Stat. 1102, 1106 (1985); 50 Fed.Reg. 42,660, 42,661 (Oct. 21, 1985); 50 Fed.Reg. 15,086, 15,088 (Apr. 16, 1985). The Secretary estimated that such farms employ approximately 64% of all hand laborers. 50 Fed.Reg. at 42,661. Believing that federal regulation of large farms would preempt state regulation of small farms, he concluded that federal promulgation of a standard would actually *reduce* total farmworker coverage (including those on both large and small farms). 50 Fed.Reg. at 15,092. In Part II.B, I explain why I believe he committed an error of law on this point. But quite apart from any such preemption, the congressional prohibi-

tion strongly colors the case. The vast majority of farmworkers work on small farms that only the states may regulate. Moreover, regulation of both large and small farms can be done on a unified, coordinated basis *only* if the states do it.[4] Thus, a deliberate congressional restriction of OSHA authority distinguishes farmworker regulation from safety and health regulation of all other industries.

*Release of federal resources.* The Secretary also argued that reliance on state regulation, in an area where the states had already been extremely active, would free federal resources for use in combating other hazards. 50 Fed.Reg. at 42,661; 50 Fed. Reg. at 15,087–90. He found, and no one disputes the point, that 13 states, encompassing approximately 75% of all person years expended in agricultural production, had already adopted their own field sanitation standards. 50 Fed.Reg. at 42,661. This relatively energetic state activity severely limited the maximum possible increase in protection that a federal standard could supply. Indeed, in his April decision not to promulgate at all the Secretary estimated—and again the estimate is not dis-

---

**3.** For example, as evidence of the Secretary's purported motivation to reshape the state-federal relationship to his personal liking, the majority reproduces, Maj.Op. at 624, a sentence of the Secretary stripped of its critical, qualifying words. The full sentence, ellipses replaced with the Secretary's actual language (emphasized), reads as follows: *However,* the Secretary continues to believe that state action *responsive to this need* would be preferable to, *and more effective than* federal action." 50 Fed.Reg. 42,660, 42,660 (Oct. 21, 1985) (emphasis added to reflect omissions in majority opinion). Another orphaned clause appearing on the same page of the majority opinion is the following (with the omitted language restored and emphasized): " 'Federalism' involves a concept designed to restore an appropriate balance of responsibility between state & federal government *and is appropriately applied in those instances where states are already taking charge of their police power responsibilities."* 50 Fed.Reg. 15,086, 15,090 (Apr. 16, 1985) (emphasis added to reflect omissions in majority opinion). (The passage goes on to note that because of congressional limitations on OSHA's authority states can reach many more workers, that states can adopt regulations better suited to the wide variety of conditions found on farms throughout the country, and that

OSHA's resources are better employed on other issues more appropriately handled by an undifferentiating federal standard. *Id.*) Basically, the Secretary argued in favor of state regulation because the factors involved in this particular case are such that state regulation would lead to the most comprehensive and effective protection for *all* of the Nation's workers, including *all* of its farmworkers, irrespective of the type of farm they work on. *E.g.,* 50 Fed.Reg. 42,660 (Oct. 21, 1985); 50 Fed.Reg. 15,086 (Apr. 16, 1985); *see infra* pp. 638–640. That the Secretary relied on his desire to provide the best possible coverage to *all* workers, and not a general preference for state regulation, is evidenced by his commitment to promulgate a federal standard if the states do not take adequate action, 50 Fed.Reg. at 42,660, and his statements that deference to the states is appropriate only where states are acting to protect their workers, 50 Fed.Reg. at 15,090.

**4.** The majority bafflingly finds that Congress's under–11 prohibition prevents the Secretary from considering the welfare of workers on such farms. Maj.Op. at 629. Part III, *infra,* develops the majority's error in inferring such congressional indifference to the welfare of two-thirds of the nation's farm workers.

puted—that a federal standard could at best increase coverage of farmworkers by an additional 4% to 9%.[5] 50 Fed.Reg. at 15,092.

As state activity and congressional constraints diminished the maximum possible gain that federal intervention could secure, the Secretary naturally compared that modest gain with the cost in enforcement resources (and thus in the health gains that deployment of those resources elsewhere might achieve). His April decision considered the issue (a consideration that he explicitly renewed in October, as explained below), and described at length some of the areas where possible regulation might save lives on a substantial scale: an asbestos standard that would avoid 8,500 cancer deaths over 45 years; an ethylene-oxide standard that was expected to reduce related deaths from a range of 532 to 1,017 to a range of 75 to 146; an inorganic arsenic standard expected to avert 11 lung cancer deaths per year in copper smelters alone; a benzene standard expected to save 822 deaths over a working lifetime. 50 Fed. Reg. at 15,088–89. He noted the limited number of available inspectors (1200 "person years" worth). *Id.* at 15,088. And he argued that inspection of isolated farms would consume inspector driving time disproportionate to the safety and health payoff, compared to inspector focus on hazardous industries typically located in highly industrialized areas. *Id.* Thus confronted with a choice between giving priority to lethal industrial hazards and generally nonlethal farm ones,[6] he elected the former.

The Secretary said all this in April. In October he noted that "OSHA has very limited enforcement resources which it has devoted primarily to protecting workers from life-threatening injuries and illnesses." 50 Fed.Reg. at 42,661. He also observed that the policy reasons behind the April decision included *"the severe limitations on OSHA's resources, OSHA's other priorities,* and the appropriateness of state action to protect farmworkers." *Id.* (emphasis added). Two sentences later he said, "While *not rejecting the policy reasons set forth in the April 16 determination,* the Secretary now finds that a different balance must be struck to give proper weight to the health risks posed." *Id.* (emphasis added). Besides thus invoking the resource-allocation issue and his April treatment of it, the Secretary in October reargued in detail the closely related point that state activity had already greatly reduced the extent to which a federal standard could increase coverage.[7] Despite his continued concern over resource allocation, he concluded that the health risk tilted the balance in favor of a commitment to federal regulation *contingent* upon the states' failing to take adequate action in the next 18 months.

The Secretary's resource-allocation concern is not undercut by § 18(b) of the Act, 29 U.S.C. § 667(b) (1982). Section 18(b) permits a state to displace federal enforcement on a specific regulatory issue by adopting an enforcement plan of its own. See *infra* n. 9. The Secretary could reasonably conclude that his threat device would be more effective in prompting the

---

5. This argument of course goes only to the number of workers covered by a standard and not the relative stringency of state and federal standards. The record indicates that some state standards are more stringent than the proposed federal standard and some less. *See* 50 Fed. Reg. at 15,086, 15,091.

6. The Secretary did note that "[t]he field sanitation standard would deal with one major health effect, heatstroke," 50 Fed.Reg. at 15,089, but he implicitly found heatstroke to pose a relatively low risk of death when compared to other major health hazards. Although the Secretary provides no concrete figures buttressing this latter

finding, *cf.* 49 Fed.Reg. 7,589, 7,593 (1984), the general proposition appears beyond dispute. *See* Brief for Petitioners at 23 ("The record reflects at least two reported cases of farmworkers dying in 1984 from heatstrokes.").

7. I am unable to discern the principle applied by the majority in deciding the relevance of the April statement. Despite the Secretary's deliberate cross-references, his April resource-allocation discussion doesn't count. Maj.Op. at 623–624 n. 11. But an April half-sentence on federalism, regarded by the majority as revelatory of legal error. Maj.Op. at 624, does.

states to take action and thereby free up federal resources than would promulgating a federal standard and waiting for the states to exercise their § 18(b) option.

The majority, seemingly conceding that the issue of "how best to allocate his agency's resources" is for the Secretary, Maj.Op. at 623, denies that the October decision was based on resource allocation at all, Maj.Op. at 623–624 & n. 11. I confess myself wholly unable to grasp the contention. Apart from slighting his affirmative reliance on the concern, the majority seeks support in the Secretary's commitment to promulgate a standard if the states do not act, saying that "The Secretary has already made [the resource-allocation] decision in favor of federal regulation of farmworkers' sanitation needs, based on current conditions." Maj.Op. at 623. But a commitment of resources *contingent* on state failure to act is altogether different from an *absolute* one. Had the Secretary made the latter, we would either have no case or be confronted with a complete about-face. Instead, the Secretary took the perfectly sensible decision to threaten the states with future regulation in the hope they would increase farmworker protection adequately and thus enable OSHA to use the released resources to protect workers elsewhere. Of course one can easily caricature the Secretary's effort to *balance* concern for the farmworkers with concern for other workers by turning language addressed to the former ("unacceptable risks") into an absolute that was clearly unintended. But such caricature is not the business of appellate courts.

*High degree of local variation.* Finally, the Secretary argued in favor of his threat device on the ground that states were better able to adopt standards responsive to "the vast differences in agricultural conditions." 50 Fed.Reg. at 42,661. He specifically pointed to variations of "size, climate, terrain, workforce density and labor intensity" that dominate farm work and produce a diversity rarely if ever equaled in other occupations. *Id.* Because each state's regulations would cover a relatively narrow range of conditions, the states regulating agricultural working conditions enjoy an unusual comparative advantage in providing protection. Under an undifferentiating federal standard, farms would chafe under a regulation designed to be all things to all people, and OSHA would have to expend resources evaluating the predictable deluge of variance requests. *See* 29 U.S.C. § 655(d) (1982). *Cf.* 50 Fed.Reg. at 15,090.

In short, the Secretary in no way relied on a generalized preference for state regulation inconsistent with congressional intent. Moved by special factors—the most prominent of which had been created by Congress itself—he simply noted that the situation was one where a threat device might enable him to have his cake and eat it: state protection of farmworkers nearly equal to and possibly superior to federal, with a release of federal resources for protection of other workers.

## B. *The Secretary's Preemption Theory*

One of the Secretary's reasons for attempting to encourage state action was his view that, by virtue of its preemptive effect, the promulgation of a federal field sanitation standard could well result in a decrease in the number of farmworkers protected by field sanitation regulations.[8] Section 18(a) of the OSH Act expressly permits state regulation of any "issue with respect to which no [federal] standard is in effect."[9] 29 U.S.C. § 667(a) (1982). Evi-

---

**8.** The Secretary also notes that preemption would deprive farmworkers of the stricter standards currently in effect in certain states. 50 Fed.Reg. at 42,661. While this is true insofar as such standards apply to large farms, the Secretary justifiably does not accord this potential loss much weight. *Id.*; 50 Fed.Reg. at 15,092. If these states, which appear to be few in number, see 50 Fed.Reg. at 15,086, 15,091, desire to keep their stricter standards, § 18(b) of the Act pro-

vides a mechanism for them to do so. *See infra* n. 9.

**9.** Section 18(b) of the OSH Act, 29 U.S.C. § 667(b) (1982), permits state regulation of issues for which federal standards are in effect if the state gets its plan certified by OSHA as meeting the standards set out in 29 U.S.C. § 667(c). Certain states, including three having field sanitation standards (California, Oregon,

dently regarding field sanitation on large and small farms as a single "issue," the Secretary concluded that the promulgation of a federal standard, though necessarily limited to farms with more than ten workers, would preempt state regulation even of farms with ten or fewer workers. That belief is spelled out unequivocally in his April statement, 50 Fed.Reg. at 15,092 (citing *New Jersey State Chamber of Commerce v. Hughey,* 600 F.Supp. 606 (D.N.J. 1985)); the October statement, though less clear, seems to draw upon the same idea, 50 Fed.Reg. at 42,661. If the supposition were true, federal relief for large-farm workers would torpedo state relief for small-farm workers.

Such a reading of § 18(a) seems unreasonable and therefore, notwithstanding the deference we owe the Secretary under *Chevron U.S.A. Inc. v. National Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), subject to our correction. Congress declared that its purpose and policy were "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b) (1982). In adopting the ten-and-under restriction in appropriations riders, it clearly qualified that intent: safety and health for the small-farm worker were not to be a subject of direct federal regulation but were to come about through the operation of market forces, state regulation, or other factors. But it would make little sense for Congress with one hand to grant states the exclusive rights to regulate small farms and with the other to subject that grant to divestiture if OSHA promulgated a standard applying to large farms.

Section 18(a)'s preemption rule serves the useful function of protecting employers from conflicting standards and a double

dose of enforcement agents. But a farm cannot, at the same time, employ both ten-or-fewer and eleven-or-more workers. Thus the conflict and duplication cannot occur—except in the sense that a farm's shift in number of employees will on occasion push it from one side of the ten-and-under line to the other and thereby change its regulator. But the duplication and conflict implicit in such a scenario seem *de minimis* when compared to Congress's unmistakable intent that "every working man and woman in the nation [be assured] safe and healthful working conditions," 29 U.S.C. § 651(b) (1982).

Accordingly, I would remand to the Secretary to reconsider his action in light of such an understanding of the law.

### III. REASONABLENESS OF THE DECISION TO DELAY

The Secretary was acutely aware of the health hazards that nonregulation would inflict on farmworkers—it was the acuteness of that perception that led him to modify his predecessor's decision not to promulgate a standard at all. But it was his right (and perhaps his duty) also to consider the possible benefits of delay, including, as he saw it: solving the practical problems deriving from Congress's ten-and-under restriction by using the threat of federal action to improve the lot of all farmworkers, releasing enforcement resources for use against hazards in other industries, and achieving a system of regulation better adapted to the wide variety of conditions on farms throughout the country. All aspects of the decision—the strong element of speculation involved in deciding the issue, the intangible character of the values at stake, and the necessary judicial ignorance of the severity of the

and North Carolina), appear to have acted under this provision to supplant federal regulation with respect to *all* health and safety issues. *See United Airlines v. Occupational Safety and Health Appeals Board,* 32 Cal.3d 762, 772, 654 P.2d 157, 163–64, 187 Cal.Rptr. 387, 393–94 (1982) (en banc); N.C.Gen.Stat. § 95–126(b)(2)(c) (1985). The field sanitation standards promulgated by such states would survive

the adoption of a federal standard, so long as the state standards meet the criteria of 29 U.S.C. § 667(c) (1982). States currently regulating field sanitation, but lacking health and safety acts entirely supplanting federal regulation on all health and safety issues, could maintain their field sanitation standards after the issuance of a federal standard by taking the appropriate steps under 29 U.S.C. § 667(b)–(h) (1982).

competing hazards on the Secretary's agenda—counsel judicial deference.

Citing Congress's expression of intent "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b) (1982), the majority seeks to derive judicially manageable restrictions on the Secretary's authority. *See* Maj.Op. at 630–32. Specifically, it finds that he lacks any discretion to withhold the immediate promulgation of a federal standard unless the states were "predispos[ed]" to adopt standards reaching "close to" 100% of all workers on large farms. *See id.*

But this rule of thumb does not readily flow from the language of the OSH Act. Indeed, Congress also expressed its intent that this goal be implemented "by developing innovative ... approaches for dealing with occupational safety and health problems," 29 U.S.C. § 651(b)(5) (1982), and by "encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws ...," *id.* § 651(b)(11). The Secretary interprets these expressions of intent as permitting him to withhold immediate promulgation of a field sanitation standard to secure the benefits already discussed. I do not find this interpretation outside the realm of reason.

The majority's generation of mechanical standards depends on a supple use of the legislative preamble's reference to assuring "so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b) (1982). It invokes the language as a basis for requiring a sort of universalism, yet it introduces qualifiers not mentioned by Congress in order to deny the Secretary's discretion to consider the welfare of small-farm workers. *Compare* the language of § 651(b) *with* "the clear standard of uniform nationwide regulation for all workers *within OSHA's jurisdiction,*" Maj.Op. at 631 (emphasis added). In effect the majority reads the restrictive appropriations riders as manifesting unqualified congressional indifference to the welfare of two-thirds of the nation's farmworkers.

There is no need to impute to Congress such a mean-spirited view. The Secretary's position, that he may consider their welfare so long as he does not directly regulate, seems fully compatible with the most likely explanation of the riders: that Congress regarded it as unsuitable for Washington officials to decree small-farm working conditions throughout the country. Yet, despite the teaching of *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the majority rejects the Secretary's interpretation without even canvassing possible congressional purposes, much less assessing their plausibility.

Having set mechanical standards for appraising the minimum acceptable state response, the majority relies on the states' earlier inaction, buttressed by hindsight, to conclude that the Secretary could not reasonably have expected adequate favorable action to occur. Maj.Op. at 631–632. Surely the issue of how a state is likely to respond to a novel experiment of this sort is not the type of judgment the courts are well equipped to make. Moreover, the history of limited state action *prior* to the Secretary's employment of his threat device is hardly relevant to a prediction of how they will respond to that device. And while hindsight indeed reveals that 12 states have told the Secretary they will not adopt standards. Maj.Op. at 633, these states only account for 9% of all farmworkers, Respondents' Letter to this Court (Nov. 13, 1986). Hindsight also shows that six states have since adopted standards, with others actively engaged in rulemaking as of November 13, 1986. *Id.*

Here the Secretary committed himself to promulgation of a federal regulation if state activity during the period of delay fell short of his standard. I would find the decision to withhold immediate promulgation arbitrary and capricious only if the Secretary had no reason to expect state action of any significance to occur. The

record provides no basis for such a conclusion.

The benefits that the Secretary sought to achieve by his threat device were ones he was entitled to consider and were on their face substantial. Their intelligent comparison with the benefits of immediate action required the expertise of the Secretary. The majority today impermissibly substitutes its judgment for his.

Even if the Secretary's delay were an abuse of discretion, the remedy would surely be to remand to the Secretary with an order to *accelerate* the proceedings. Instead, the court orders him to promulgate immediately a set of regulations that he viewed as only contingently suitable. Thus the court commits the Secretary's enforcement resources to the nation's farms, at the expense of enforcement against lethal hazards elsewhere, without so much as allowing him an opportunity to review the situation under the majority's view of the law. That is not the role of a reviewing court. *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

### IV. THE SETTLEMENT AGREEMENT

Petitioners contend, and the separate concurrence agrees, that the settlement agreement entered into by the parties during an earlier phase of this litigation compels us to order the Secretary to immediately promulgate a field sanitation standard. The record does not support this contention.

In 1973 petitioners filed an action challenging the Secretary's delay in promulgating a field sanitation standard. In 1982, after nine years of litigation, including two appeals to this court, the parties tired of thrashing about in this legal quagmire and entered into a settlement agreement. The agreement compelled the Secretary to (1) "make a good faith effort to undertake and to complete the development of a field sanitation standard," Joint Appendix ("J.A.") at 12, and (2) to publish, within a prescribed time period, either a field sanitation standard or a final determination not to issue such a standard, *id.* at 12–14. In return, the agreement committed petitioners to dismiss the proceedings once the Secretary performed his end of the bargain. *Id.* at 12.

On April 16, 1985, within the time period of the settlement agreement (as extended by court order), the Secretary published his "final" decision not to promulgate a field sanitation standard. 50 Fed.Reg. 15,086. Petitioners then challenged the Secretary's decision as violating the settlement agreement and contested the Secretary's decision on the merits. The Secretary moved for dismissal of both actions.

While these motions were pending, a new Secretary took office, causing petitioners to request reconsideration of the April 16 decision and immediate promulgation of a field sanitation standard. J.A. at 41–48. The Secretary agreed to reconsider the matter, and on October 21, 1985 vacated the April 16 decision and committed himself to promulgating a federal standard if the states failed to regulate adequately within two years. 50 Fed.Reg. 42,660. Petitioners now assert that the October 21 decision violates the settlement agreement. I disagree.

The settlement agreement required the Secretary to come to a final resolution of the field sanitation issue within a specified time. J.A. at 12–14. If the Secretary believed he could not meet this deadline, he was required to file an affidavit with the District Court and petitioners explaining why he thought the timetable could not be met, and, if petitioners objected, to demonstrate that the proposed deferral was in good faith. *Id.* at 13–14.

When petitioners asked the Secretary to reconsider the April decision, they brought about a situation not contemplated by the original agreement. While of course the request in itself did not deprive them of their right to challenge the Secretary's negative decision on substantive grounds, it clearly ran the risk that he would act in a manner that mooted that case, as, for example, by promulgating a standard that

provided less protection than the pending draft. At a minimum, it would seem that their request had the effect of waiving the right to insist on *technical* compliance with the settlement (*i.e.*, the Secretary's filing with the District Court for additional time). This left them with, at most, an entitlement to review of the Secretary's action for good faith.

In large part the good faith issue is resolved by consideration of the problem before him, discussed above. With reference to the special problem of delay under the settlement agreement, I find it hard to see how the Secretary's partial responsiveness to petitioners' own demands in any way manifested a lack of good faith.

In any event, the settlement agreement related solely to the matter of delay. No violation of it by the Secretary could justify ordering him to promulgate the draft as a final regulation, denying him any chance to consider the scope of intervening state activity or the overall merits of issuing such a rule.